**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pearl Wilson, Personal Representative of the Estate of Phillip Wilson, deceased; and Terry and Pearl Wilson, surviving parents of Phillip Wilson,<br><br>Plaintiffs,<br><br>vs.<br><br>Maricopa County, a public entity; Maricopa County Sheriff's Office, a division of Maricopa County; Joseph M. Arpaio, Maricopa County Sheriff, and Ava Arpaio, his wife; Maria Leon and John Doe Leon, her husband; Mark W. Stump and Jane Doe Stump, his wife; Rocky Medina and Jane Doe Medina, his wife; and Mickie Curtis and Jane Doe Curtis, his wife,<br><br>Defendants. | No. CV-04-2873-PHX-DGC<br><br>**ORDER** |

Defendants have filed motions for summary judgment on all claims and the parties have filed several motions to strike. Dkt. ##204, 210, 221, 269, 272. Plaintiffs also have filed a motion for reconsideration of the Court's order dismissing Defendant Maricopa County Sheriff's Office. Dkt. #212. The Court heard oral argument on October 27, 2006. Dkt. #295. For the reasons set forth below, the Court will grant the motions for summary judgment in part, deny them in part, and deny the motions to strike and the motion for reconsideration.

**I.     Background.**

Phillip Wilson was an inmate at a Maricopa County jail known as "Tent City." On July 22, 2003, Wilson was assaulted by other inmates and later died from his injuries. The assault occurred at approximately 2:45 p.m., while Wilson was in Tent 3 in Yard 1.

Defendant Maria Leon was the Shift 1, Yard 1 tower officer on duty at the time of the assault. Shift 1 runs from 7:00 a.m. to 3:00 p.m. Defendant Mickie Curtis was a Shift 1 supervisor and Defendants Mark Stump and Rocky Medina were Shift 2 supervisors on the day of the assault. Shift 2 runs from 3:00 p.m. to 11:00 p.m.

Plaintiff commenced this action by filing a complaint in state court on November 5, 2004. *See* Exs. to Dkt. #1. Defendants removed the case to this Court on December 13, 2004. Dkt. #1. Plaintiffs assert claims against all Defendants under 42 U.S.C. § 1983 for violations of Phillip Wilson's constitutional rights under the Eighth and Fourteenth Amendments and violations of Terry and Pearl Wilson's Fourteenth Amendment rights in the continued familial companionship and society of their son Phillip. Am. Compl. ¶¶ 39-50. Plaintiffs also allege negligence and gross negligence claims against all Defendants under Arizona law. *Id.*

**II.    The Motions for Summary Judgment.**

   **A.     Summary Judgment Standard.**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jesinger*, 24 F.3d at 1130. The disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

/ / /

**B.     The § 1983 Claims Based on Alleged Violations of Phillip Wilson's Eighth Amendment Rights.**[1]

      **1.     The Claims Against Maricopa County and Sheriff Arpaio in His Official Capacity.**

Municipal liability under § 1983 can result from the unconstitutional actions or omissions of the municipality's final policymaker. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (holding that a municipality's policy or custom that inflicts a constitutional injury may subject the municipality to § 1983 liability whether the policy or custom was "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy"); *City of Canton v. Harris*, 489 U.S. 378, 388-90 (1989) (holding that the failure of a municipality's policymakers to ensure adequate police training may serve as the basis for § 1983 liability). Whether a particular official has final policymaking authority is a matter of state law. *See McMillian v. Monroe County*, 520 U.S. 781, 786 (1997); *Cortez v. County of L.A.*, 294 F.3d 1186, 1189 (9th Cir. 2002) ("To determine whether the Sheriff was acting as the final policymaker for the County, we follow the analytical framework set forth in *McMillian*.").

The parties do not dispute that Sheriff Arpaio has final policymaking authority under Arizona law with respect to the operation of County jails. *See* Dkt. #236 at 9 (citing Dkt. #240 ¶ 170); Ariz. Const. art. XII, §§ 3-4 (providing that there shall be created in and for each County of the State a Sheriff and that the Sheriff's duties, powers, and qualifications shall be as prescribed by law); A.R.S. § 11-441(A)(5) ("The sheriff shall . . . [t]ake charge of and keep the county jail . . . and the prisoners in the county jail."); *Flanders v. Maricopa*

---

[1] Plaintiffs allege that Defendants' conduct and the conditions at Tent City constitute violations of Wilson's Eighth Amendment rights as well as his substantive due process rights under the Fourteenth Amendment. Am. Compl. ¶¶ 41, 43. Because the constitutional claim at issue is specifically covered by the Eighth Amendment, the claim must be analyzed under Eighth Amendment standards rather than the standards for substantive due process. *See United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.") (citing *Graham v. Connor*, 490 U.S. 386 (1989)).

1  *County*, 54 P.3d 837, ¶ 35 (Ariz. Ct. App. 2002) ("The County acknowledged that the Sheriff
2  was its chief policymaker for [Tent City]."); *Judd v. Bollman*, 803 P.2d 138, 139-40 (Ariz.
3  Ct. App. 1991) (stating that a sheriff has the duty "to maintain and operate the county jails
4  pursuant to the Arizona Constitution and A.R.S. § 11-441"); *see also Cortez*, 294 F.3d at
5  1189 ("[T]he County is subject to § 1983 liability for the Sheriff's actions taken here
6  pursuant to his role as administrator of the county jail.").

7  Plaintiffs asserted at oral argument that Defendants Stump, Medina, and Curtis also
8  are "final policymakers" for purposes of municipal liability under § 1983 because they had
9  the responsibility of actually training jail officers. Plaintiffs did not make this argument in
10 their summary judgment briefs. *See* Dkt. ##236-37. Nor have Plaintiffs presented any
11 evidence that these Defendants made final policy decisions for the County with respect to
12 training. As noted above, Arizona law makes clear that the Sheriff is the final policymaker
13 for the County's jails. *See* Ariz. Const. art. XII, §§ 3-4; A.R.S. § 11-441(A)(5). The Court
14 accordingly concludes that Sheriff Arpaio is the County's final policymaker for purposes of
15 municipal liability under § 1983 arising out of events at Tent City. *See Flanders*, 54 P.3d
16 ¶ 63 ("There may be no 'clearer case of county liability' than for the policies of a sheriff
17 charged by law with responsibility for a county's jails.") (citation omitted). The Court will
18 therefore focus on Sheriff Arpaio in deciding whether Plaintiffs' claim against the County
19 survives summary judgment.

20              **a.     Two Routes to Municipal Liability.**

21 The Ninth Circuit has held that there are two routes to municipal liability under
22 § 1983. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002). Both are
23 relevant in this case.[2]

24 / / /

25

26 [2] In addition to the deliberate indifference discussed in the text that follows, an Eighth
27 Amendment claim requires that the alleged constitutional deprivation be objectively
   "sufficiently serious." *Farmer*, 511 U.S. at 834. Because Defendants do not dispute that the
28 deprivation alleged in this case – Phillip Wilson's death – is sufficiently serious under
   *Farmer*, the Court will not address this element.

- 4 -

The first route applies when a municipality inflicts a constitutional injury through its policy, custom, or practice. *Id.* (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997)). Under this route, the plaintiff must satisfy traditional § 1983 requirements and show that "the municipality acted with 'the state of mind required to prove the underlying violation,' just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Gibson*, 290 F.3d at 1187 (quoting *Brown*, 520 U.S. at 405). The state of mind required for violation of Phillip Wilson's Eighth Amendment rights is one of "deliberate indifference." *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This kind of deliberate indifference occurs when an official disregards "a risk of harm of which he is aware." *Id.* at 837. The requirement is one of actual, subjective intent – "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The second route to municipal liability arises from the Supreme Court's decision in *City of Canton v. Harris.* Under this route, a municipality becomes responsible, through its omissions, for a constitutional violation committed by one of its employees. *See Gibson*, 290 F.3d at 1186 (citing *City of Canton*, 489 U.S. at 387). The plaintiff need not prove that the municipality acted with actual, subjective intent. *Id.* at 1186. Rather, the plaintiff "must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation," and yet failed to act. *Id.* This kind of deliberate indifference is found when the need to remedy the omission is so obvious, and the failure to act so likely to result in the violation of rights, that the municipality reasonably can be said to have been deliberately indifferent when it failed to act. *Id.* at 1195.

In this case, Plaintiffs have presented sufficient evidence under both routes. Viewing the evidence in the light most favorable to Plaintiffs, as the Court must do at this summary judgement stage, the Court concludes that there is evidence from which a jury reasonably could find that the County, through its final policy maker, Sheriff Arpaio, implemented policies, customs, and practices with the requisite subjective intent of deliberate indifference. There also is evidence from which a jury reasonably could find that the County, through

Sheriff Arpaio, failed to act in the face of obvious omissions and likely constitutional violations, and that the failure to act caused a constitutional violation. The Court will describe some of the evidence that satisfies both routes.

### i. The Policy of Using Tents.

Plaintiffs have presented evidence that Defendant Leon was the only officer overseeing Yard 1 at the time of the assault. Her duty was to conduct surveillance, not to supervise inmates or respond to situations on the ground. She had limited hearing capabilities because the tower windows were closed, and she was unable to see inside Tent 3 because the flaps had been pulled down. Dkt. #238 ¶¶ 71-74, 84-91, 136-38, 141, 143.

Defendant Leon testified that she was not suspicious when inmates gathered around and entered Tent 3, which was the only tent in Yard 1 with its flaps down, because Tent City is an open-yard facility and inmates are permitted to roam the yards and lower tent flaps. *Id.* Ex. 3 at 64, 220-21. A County official and a jail security consultant retained by the County have concluded that the use of tents makes it difficult to supervise and control inmates. *Id.* ¶¶ 60, 86. The consultant recommended that tents be phased out. *Id.* ¶ 140.

### ii. Customs and Practices Leading to a Lack of Supervision.

Plaintiffs have presented evidence that, due to jail customs and practices, no officer was on the ground in Yard 1 at the time of Phillip Wilson's assault. Officer Jeffrey Woolf was assigned to cover both the Yard 1 and the West Gate posts due to a staff shortage. The West Gate assignment required Woolf to leave Yard 1 and escort the inmate kitchen crew to and from Durango Jail. Woolf was not in Yard 1 at the time of the assault because he escorted the kitchen crew and then made an early shift change outside the Tent City facility. Dkt. #238 ¶¶ 83-84, 92, 96-99.

Defendant Leon has testified that it was "routine" and "very common" for officers to leave their yards and escort the kitchen crew to and from Durango Jail. *Id.* Ex. 3 at 221-22. Officer Woolf has testified that it was "common practice" for officers to leave Yard 1 to cover the West Gate post when there was a staff shortage. *Id.* Ex. 7 at 44, 99. Defendant

Curtis has testified that in such a situation, only the tower officer would be overseeing Yard 1 with "nobody on the ground." *Id.* Ex. 8 at 107. Defendant Curtis also has testified that it was "standard practice" for officers to make shift change outside the Tent City facility when supervisors were "running short" on staff. *Id.* Ex. 8 at 96-97. Both Woolf and Curtis have testified that shift changes often occurred off-yard and "wherever" the on-duty officer happened to be at the Tent City facility. *Id.* Ex. 7 at 44, 106; Ex. 8 at 96.

The County acknowledges that "occasionally the Yard 1 officer also served as the West Gate officer during Shift 1." Dkt. #204 at 10. The County contends, however, that Yard 1 was never abandoned because Leon was in the Yard 1 tower and Officer Contreras, the Yard 2 officer, was within hearing distance of Yard 1. The County states that because Contreras could hear what was going on in Yard 1, reasonable correctional standards were being met and deliberate indifference cannot be found. The County admitted during oral argument, however, that it does not know where Officer Contreras was at the time of the assault. Moreover, the County admits that "[n]either Officers Woolf nor Contreras responded to the man down call because they had been relieved of their duties early by the incoming Shift 2 officers." *Id.* at 4. A reasonable jury could therefore conclude that Officer Contreras was not adequately overseeing Yard 1 and was not in position to hear or respond promptly to the assault. The County has presented no evidence that Contreras' replacement, the Shift 2, Yard 2 officer, was on duty and in the yards when the assault occurred.

A reasonable jury could also find that the County's contention that there was adequate supervision because only 12-15 inmates were in Yard 1 at the time of the assault lacks merit because there was no officer on the ground at the time. Moreover, the exact number of inmates in the yard is a question for the jury. Leon has testified that there were "a lot of inmates" in Yard 1 at the time of the assault. Dkt. #238, Ex. 3 at 162.[3]

---

[3] The County contends in a footnote that "shift changes taking place a few minutes early, at 2:46 p.m., for example, rather than exactly at 3:00 p.m., do[] not demonstrate negligence, much less gross negligence, and certainly not deliberate indifference." Dkt. #204 at 4 n.2. The County misses the point. It is the location of the shift changes, not their time, that is problematic. A reasonable jury could conclude that shift changes which leave yards

- 7 -

### iii.    Alleged Omissions.

Plaintiffs argue that Sheriff Arpaio failed to train his jail officers with respect to adequate staffing and maintaining continuous yard presence. Dkt. #237 at 15. Defendants contend that this argument fails as a matter of law because "virtually all of the detention officers testified that shift changes should occur on the yard." Dkt. #201 at 9-10.

As explained above, however, Plaintiffs have presented evidence that the officers routinely abandoned their assigned yards for significant periods of time and had a practice of making off-yard shift changes. Defendant Curtis has testified that he taught the officers that it was proper to make shift changes "wherever" the on-duty officer happened to be at the time of the change. Dkt. #238, Ex. 8 at 96. Curtis provided this training despite knowing that it was important to always have an officer on the ground in each yard to prevent inmate-on-inmate assaults. *Id.* at 95. Both Defendant Leon and Officer Woolf have testified that the supervisors taught them that it was proper for an officer to leave Yard 1 and escort the kitchen crew to and from Durango Jail when the officer was assigned to both the Yard 1 and West Gate posts. *Id.* Ex. 7 at 39-40; Ex. 3 at 221-22. Officer Woolf further testified that he had not read the Tent City policies regarding the proper supervision of inmates, he never received any formal training before being placed in the yards, and he was trained by "word of mouth." *Id.* Ex. 7 at 20, 37-38. A jury reasonably could conclude from this evidence that there was a lack of training with respect to the proper supervision of Tent City inmates.

### iv.    Deliberate Indifference.

Plaintiffs have presented evidence that Sheriff Arpaio has, for many years, been aware that conditions at Tent City were likely to create a substantial risk of serious harm to inmates. Dkt. #240 ¶¶ 80, 187. These conditions include a lack of security inherent in the use of tents, inadequate staffing, officers abandoning their posts and making off-yard shift changes, harsh inmate living conditions, and a lack of officer training. Dkt. #238 ¶¶ 60-67, 77, 85-88, 140,

---

unsupervised subject inmates to excessive risks of harm in violation of the Eighth Amendment.

145; Dkt. #240 ¶¶ 81-82, 89-95, 110, 112-19, 184, 188.  These issues have been made known to the Sheriff through a variety of sources, including consultant reports, concerns expressed by County risk management, and a prior state court case in which the County and Sheriff were held liable under § 1983 for an inmate assault at Tent City.  Dkt. #238 ¶¶ 60, 63-67, 86-88, 140; *see Flanders*, 54 P.3d 837.  Moreover, Defendants do not dispute that County officers understand that leaving inmates unattended creates an excessive risk of inmate-on-inmate violence.  Dkt. ##201 at 10, 204 at 10.

Reasonable minds could disagree on whether the allegedly dangerous conditions at Tent City should be viewed as policies, customs, and practices of the Sheriff, or as omissions by him and the County.  *See Canton*, 489 U.S. at 386 n.5 (noting that the plaintiff's "claim of an unconstitutional 'custom' appear[ed] to be little more than a restatement of her 'failure-to-train as policy' claim"); *Gibson*, 290 F.3d at 1194-95 (construing the failure-to-train claim in *Canton* as an omission).  Whether considered under the Ninth Circuit's first or second routes to liability, however, the Court concludes that Plaintiffs have presented sufficient evidence for a reasonable jury to find deliberate indifference on the part of Sheriff Arpaio, the County's final policymaker for Tent City.  *See Farmer*, 511 U.S. at 837; *Canton*, 489 U.S. at 390; *see also Gibson*, 290 F.3d at 1193-95 (holding that the plaintiff presented evidence sufficient to establish both kinds of deliberate indifference); *Flanders*, 54 P.3d ¶¶ 55-56 (holding that the lack of supervision and security measures at Tent City supported the jury's finding of deliberate indifference and stating that the jury was entitled to disbelieve the Sheriff's testimony that he was unaware of unsafe conditions at Tent City).

### b.     Causation.

To prove a § 1983 claim, Plaintiffs must show that Defendants' deliberately indifferent actions caused the death of Phillip Wilson.  "Causation is generally a question of fact for the jury[.]"  *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 770 (9th Cir. 1981).  To establish causation under § 1983, a plaintiff must prove that the defendant's actions or omissions were the "moving force" behind the violation of the plaintiff's constitutional rights.  *See Gibson*, 290 F.3d at 1196.  In order to be a "moving force," the plaintiff must

1 show that the alleged unconstitutional actions or omissions were "'closely related to the
2 ultimate injury.'" *Id.* (quoting *Canton*, 489 U.S. at 391); *see Oviatt v. Pearce*, 954 F.2d
3 1470, 1478 (9th Cir. 1992) (same).

4 Defendants contend that Plaintiffs cannot link Phillip Wilson's assault to the absence
5 of Officer Woolf from Yard 1 because Defendant Leon and Officer Contreras were able to
6 see and hear the inmates in Yard 1. Dkt. #204 at 11. As explained above, however, it
7 appears that Contreras was not on any of the Tent City yards at the time of the assault, and
8 Leon was not authorized to leave the tower and respond to the assault. There is also a
9 genuine issue of fact as to whether Leon was able to hear the inmates on Yard 1.

10 Defendants further contend that Plaintiffs have presented no evidence regarding the
11 assailants' motives or that the assault would not have been "arranged" if the conditions at
12 Tent City had been different. Dkt. #201 at 7. The assailants' motives for the assault,
13 however, are not the issue. Even assuming the assailants were determined to harm Wilson,
14 there are still genuine issues of fact as to whether the Sheriff's alleged deliberate indifference
15 to dangerous conditions at Tent City permitted the assault to occur.

16                           **c.     Conclusion.**

17 The Court will deny summary judgment with respect to the Eighth Amendment claim
18 against the County and Sheriff Arpaio in his official capacity. Plaintiffs have presented
19 sufficient evidence to preclude summary judgment. *See Gibson*, 290 F.3d 1175 (reversing
20 summary judgment because fact issues existed as to whether the county's policies and
21 omissions regarding inmates' medical needs violated a deceased inmate's constitutional
22 rights); *Redman v. County of San Diego*, 942 F.2d 1435 (9th Cir. 1991) (en banc) (holding
23 that jury issues existed as to whether jail officers were acting pursuant to county policies or
24 customs by placing a detainee in a cell with an "aggressive homosexual" and whether the
25 sheriff was deliberately indifferent to the detainee's right to personal security).

26              **2.     The Claims Against Defendants in Their Individual Capacities.**
27                       **a.     Sheriff Arpaio.**
28 Sheriff Arpaio acknowledges that § 1983 liability "may be imposed against an official

in his individual capacity for his own culpable actions or inactions if he fails to properly supervise and control subordinates; acquiesces in the constitutional deprivations complained of; or engages in conduct that shows 'reckless or callous indifference' to the rights of others." Dkt. #201 at 9 (citing *Larez v. City of L.A.*, 946 F.2d 630, 646 (9th Cir. 1991)); *see Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000) (same); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("[Section 1983 liability] arises only upon a showing of personal participation by the defendant. A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."). The Sheriff contends, however, that "Plaintiffs do not allege that Sheriff Arpaio failed to properly supervise or control his subordinates, or that he acquiesced in any constitutional deprivation by his subordinates." *Id.*

The Court disagrees. Plaintiffs amended complaint alleges that Sheriff Arpaio is directly liable under § 1983 for being deliberately indifferent in failing to supervise and train jail officers in the appropriate, lawful, and constitutional policies and procedures for providing a safe environment for inmates in Tent City. Am. Compl. ¶ 34. Plaintiffs further allege that the Sheriff was deliberately indifferent in fostering, encouraging, and knowingly accepting formal and informal jail policies condoning brutality among the inmates and indifference to proper supervision. *Id.* ¶ 34; *see id.* ¶ 38(e) ("The[] unconstitutional *de facto* policies condoned by Defendants include . . . the failure to adequately train and supervise jail personnel[.]"). Plaintiffs have thus alleged a § 1983 claim against the Sheriff in his individual capacity.

The Sheriff contends that he is entitled to qualified immunity. Dkt. #201 at 16-17. In determining whether a defendant is entitled to qualified immunity, a court first asks whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the alleged facts show a violation of a constitutional right, the court next determines whether the plaintiff has shown that the right was clearly established

1  at the time of the violation. *See id.* Finally, if the right was clearly established, yet based on
2  the circumstances a reasonable person in the defendant's position could have made a mistake
3  regarding what the law required, the defendant will be entitled to immunity. *See id.* at 205.

4  Based on the present record, the Court concludes that Sheriff Arpaio is not entitled
5  to qualified immunity. Plaintiffs have made a prima facie case of a constitutional violation.
6  As explained above, it is undisputed that the injury to Phillip Wilson was sufficiently serious,
7  and both direct and circumstantial evidence would enable a jury reasonably to conclude that
8  Sheriff Arpaio acted with deliberate indifference. In addition, Plaintiffs have shown that the
9  right allegedly violated was clearly established at the time of the assault. Dkt. #236 at 18-19
10 (citing *Farmer*, 511 U.S. at 832-33 (stating that the Eighth Amendment imposes a duty on
11 jail officials to "'take reasonable measures to guarantee the safety of the inmates'") (quoting
12 *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *Flanders*, 54 P.3d ¶ 50 ("The Eighth
13 Amendment imposes duties on prison officials to take reasonable measures to guarantee
14 inmate safety. In particular, prison officials have a duty to protect inmates from violence at
15 the hands of other inmates.") (citing *Farmer*, 511 U.S. at 832)). Finally, the Court cannot,
16 as a matter of undisputed fact, conclude that a reasonable sheriff in Defendant Arpaio's
17 position could have made a mistake as to what the law required with respect to the safety of
18 inmates at Tent City. *See Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998) (stating
19 that when the qualified immunity "answer depends on genuinely disputed issues of material
20 fact, the court must submit the fact-related issues to the jury").[4]

21 Because Plaintiffs have made a prima facie case of a constitutional violation and
22 Defendants have not shown that Sheriff Arpaio is entitled to qualified immunity as a matter
23 of law, the Court will deny summary judgment with respect to the Eighth Amendment claim
24 against Sheriff Arpaio in his individual capacity. *See Sorrels v. McKee*, 290 F.3d 965, 969
25 (9th Cir. 2002) ("The first prong of qualified immunity . . . mirrors the substantive summary
26 judgment decision on the merits.").

---

28  [4] The ruling that Sheriff Arpaio is not entitled to qualified immunity does not apply to the other individual Defendants. They have not asserted claims of immunity.

- 12 -

### b. Defendant Leon.

Plaintiffs have presented evidence of the following with respect to Defendant Leon: Leon knew that Officer Woolf had left Yard 1 to escort the kitchen crew to and from Durango Jail. Leon witnessed inmates returning from Durango Jail and knew that most of the officers were at the East Gate searching the returning inmates for contraband. She saw "a lot" of inmates enter Yard 1, two of which had their shirts off. Seven or eight of the inmates entered Tent 3, which was the only tent in Yard 1 with its flaps down. Leon watched as a crowd gathered around Tent 3 and as a group of inmates in an adjacent tent were looking into Tent 3 – the first time that Leon got the idea that "something was going on." She could not hear what was going on because the windows in her tower were closed. She continued to watch as inmates started running out of Tent 3 towards the Yard 1 gate. She then saw two inmates under her tower trying to get her attention. She opened her window and the inmates informed her that someone had been assaulted in Tent 3. Leon then made a "man down" call over her radio. Dkt. #238 ¶¶ 182-191, 193-97, Ex. 3 at 160-70.

Plaintiffs have presented no evidence that Defendant Leon saw weapons, saw or heard threats, or otherwise knew inmates were entering Tent 3 to commit an assault. One might conclude that she was negligent in not promptly alerting other officers to the unusual situation, but negligence is not sufficient for liability under § 1983. A jail official must know of and disregard an excessive risk to inmate health or safety. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference." *Farmer*, 511 U.S. at 837. The evidence presented by Plaintiffs does not show that Leon actually knew of an excessive risk to inmate health or safety and chose to disregard it. Leon testified that the shirtless inmates did not cause her to be suspicious of anything. The temperature in Yard 1 at the time was 108 degrees. Although the crowd around Tent 3 raised some suspicion, she knew that inmates were free to move about the open yard. Leon made a man down call as soon as she learned there had been an assault.

/ / /

The Court concludes that Plaintiffs have not presented sufficient evidence for a reasonable jury to conclude that Defendant Leon acted with deliberate indifference to inmate health and safety. The Court will grant summary judgment with respect to the § 1983 claim against her.

### c.  Defendants Stump and Medina.

Defendants Stump and Medina were Shift 2 supervisors on the day of the assault. Plaintiffs contend that these Defendants were responsible for Wilson's assault because it "occurred during the shift changes." Dkt. #237 at 21. Plaintiffs have presented evidence that Stump and Medina were in the supervisors' office briefing the Shift 2 officers when the assault occurred at 2:46 p.m. *Id.* (citing Dkt. #238 ¶ 203). Shift 2 did not start until 3:00 p.m. Plaintiffs have presented no evidence that Stump and Medina were aware that Officer Woolf had left his Yard 1 post. The fact that Stump and Medina were in the supervisors' office briefing the Shift 2 officers prior to the start of Shift 2 does not create a genuine issue of fact as to whether Stump and Medina were deliberately indifferent to an excessive risk to prisoner safety. The Court will grant summary judgment with respect to the § 1983 claims against Defendants Stump and Medina.

### d.  Defendant Curtis.

Plaintiffs have presented evidence of the following with respect to Defendant Curtis: Curtis was the Shift 1 supervisor. Curtis knew that it was important to make sure officers stayed on the ground in Yard 1 due to the risk of harm posed by unattended inmates. Dkt. #238, Ex. 8 at 95. Curtis was involved in assigning Woolf to both the Yard 1 and West Gate posts, knowing that the dual assignment would require Woolf to leave Yard 1 when he was escorting the kitchen crew. *Id.* Ex. 3 at 199-200; Ex. 6; Ex. 8 at 96-100. Curtis knew that only Leon was overseeing Yard 1 on the day of the assault. *Id.* Ex. 8 at 99.

Construing this evidence in Plaintiff's favor, a jury reasonably could conclude that Curtis was deliberately indifferent. He knew that not having an officer on the ground in Yard 1 posed a risk of violence among the inmates. He nonetheless allowed Officer Wolf to cover both the Yard 1 and West Gate posts, which required Woolf to leave Yard 1

- 14 -

unattended for a significant period of time. The Court will deny summary judgment with respect to the § 1983 claim against Defendant Curtis.

### e. **Punitive Damages.**

Punitive damages under § 1983 are not recoverable against a municipality or an officer sued in his official capacity, but are recoverable against officials sued in their individual capacities. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Smith v. Wade*, 461 U.S. 30 (1983). Punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56. This standard "applies even when the underlying standard of liability for compensatory damages is one of recklessness." *Id.*

As explained above, there are genuine issues of fact as to whether Sheriff Arpaio and Defendant Curtis were deliberately indifferent to inmates' constitutional rights. The Court accordingly will deny summary judgment with respect to the § 1983 claim for punitive damages against them.

### C. **The § 1983 Claims Based on Alleged Violations of Terry and Pearl Wilson's Fourteenth Amendment Rights.**

Relying on *Trujillo v. Board of County Commissioners*, 768 F.2d 1186, 1190 (10th Cir. 1985), Sheriff Arpaio contends that Terry and Pearl Wilson's Fourteenth Amendment claim must be dismissed because the amended complaint does not allege that the Sheriff "intended" to interfere with their rights of familial relationship and society. Dkt. #201 at 15. The Ninth Circuit, however, has explicitly rejected the intent requirement in *Trujillo*. *See Smith v. City of Fontana*, 818 F.2d 1411, 1420 n.12 (9th Cir. 1987) ("We . . . decline to follow *Trujillo*. As long as the state official's action which deprived the plaintiffs of their liberty was more than merely negligent, the plaintiffs can state a section 1983 claim without further alleging that the official was trying to break up their family."), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999); *Rentz v. Spokane County*, 438 F. Supp. 2d 1252, 1264 (E.D. Wash. 2006) ("The Ninth Circuit . . . [has]

1  refus[ed] to impose *Trujillo*'s limitation requiring proof of specific intent to interfere with
2  the family relationship.") (citing *Ward v. City of San Jose*, 967 F.2d 280, 283 (9th Cir.
3  1992); *see also Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998) (stating that a plaintiff
4  must allege that the official acted with "deliberate indifference" to maintain a right to familial
5  relationship claim), *abrogation on other grounds recognized by Moreland v. Las Vegas*
6  *Metro. Police*, 159 F.3d 365, 369-70 (9th Cir. 1998).

7  Sheriff Arpaio further contends that Plaintiffs have presented no evidence that
8  "an official policy or custom deprived inmates' parents of the constitutional right of familial
9  association." Dkt. #201 at 16. The Ninth Circuit, however, "has consistently recognized . . .
10 a Fourteenth Amendment liberty interest of parents in the companionship and society of their
11 adult children, even when the deprivation of that interest is incidental to the state action."
12 *Rentz*, 438 F. Supp. 2d at 1264 (citing cases); *see Robertson v. Hecksel*, 420 F.3d 1254, 1258
13 n.4 (11th Cir. 2005) ("The Ninth Circuit appears to have recognized the asserted right where
14 the state action had the incidental affect of ending the parent/adult child relationship.")
15 (citing cases). As described above, Plaintiffs have presented evidence sufficient to show that
16 unconstitutional actions and omissions by the Sheriff had the effect of ending the Wilsons'
17 relationship with their son.

18 The Court will deny summary judgment with respect to Terry and Pearl Wilson's
19 Fourteenth Amendment claim under § 1983. *See Rentz*, 438 F. Supp. 2d at 1265 (denying
20 summary judgment on the plaintiffs' Fourteenth Amendment claim against various county
21 defendants for failing to protect the plaintiffs' son from harm at the hand of other inmates).

22 **D.  The State Law Claims.**

23 **1.  The Negligence Claims.**

24 Plaintiffs concede that their negligence claims are barred by A.R.S. § 12-
25 820.02(A)(4). Dkt. #236 at 16 n.10. The Court will therefore grant summary judgment.

26 **2.  The Gross Negligence Claims.**

27 Under Arizona law, gross negligence "is action or inaction with reckless indifference
28 to the result or the rights or safety of others. A person is recklessly indifferent if he or she

1  knows, or a reasonable person in his or her position ought to know:  (1) that his action or inaction creates an unreasonable risk of harm; and (2) the risk is so great that it is highly probably that harm will result." *Armenta v. City of Casa Grande*, 71 P.3d 359, ¶ 20 (Ariz. Ct. App. 2003).

### a. Sheriff Arpaio.

As explained above, Plaintiffs have presented evidence that Sheriff Arpaio was deliberately indifferent to the rights and safety of the Tent City inmates.  Sheriff Arpaio contends that, to the extent Plaintiffs are suing him in his official capacity, the gross negligence claim is barred under A.R.S. § 12-820.01(A)(2). Dkt. #201 at 18-19.  That statute provides that "[a] *public entity* shall not be liable for [certain] acts or omissions of its employees[.]" A.R.S. § 12-820.01(A)(2) (emphasis added).  By its very terms, § 12-820.01 applies to public entities, not public officials.  Sheriff Arpaio has cited no legal authority for the proposition that he is entitled to absolute immunity as a public employee. *See* A.R.S. § 12-820.02 (providing public employees with only qualified immunity for certain actions within the scope of their employment); *see also Doe v. Doe*, 24 P.3d 1269, ¶ 4 (Ariz. 2001) (en banc) (stating that courts "construe immunity provisions narrowly").  Morever, Plaintiffs allege that Sheriff Arpaio himself was grossly negligent, not that he is vicariously liable for the alleged gross negligence of his employees.  The Court will deny summary judgment with respect to the gross negligence claim against Sheriff Arpaio.

### b. Defendant Leon.

To find Defendant Leon liable for gross negligence, a jury must conclude that she knew, or a reasonable person in her position ought to have known, that her action or inaction created an unreasonable risk of harm to another and that the risk was so great that it was highly probable that harm would result. *Armenta*, 71 P.3d at ¶ 20.  For the reasons set forth above, Plaintiffs have not shown that Defendant Leon knew or ought to have known that the gathering of inmates at Tent 3 created an unreasonable risk of harm to another.  Nor have they presented evidence that she knew such harm was highly probable.  The evidence might support a finding that she was negligent, but the Court does not find sufficient evidence to

1  support a claim of gross negligence. The Court will grant summary judgement in her favor
2  on the gross negligence claim.

### c. Defendants Stump and Medina.

Plaintiffs' evidence against Defendants Stump and Medina is even less probative of gross negligence than the evidence against Defendant Leon. Defendants Stump and Medina were briefing the Shift 2 officers prior to the start of Shift 2. There is no evidence that a reasonable person in Defendants' position would have known that their conduct created an unreasonable risk of harm to inmates and that harm was highly likely to result. The Court will grant summary judgment with respect to the gross negligence claims against Defendants Stump and Medina.

### d. Defendant Curtis.

Defendant Curtis was the Shift 1 supervisor on the day of the assault. Curtis admitted having knowledge that leaving inmates unattended posed a substantial risk of harm to the inmates. The official policy regarding the duties of yard officers provides that their "presence prevents assaults and disturbances." Dkt. #238 Ex. 38. It further provides that being assigned to Yard 1 requires "being visible to the inmates on the yard and watching all areas for escapes/illegal activity." *Id.* Curtis' assigning Officer Woolf to cover both the Yard 1 and West Gate posts, knowing that Woolf would be required to leave Yard 1 unattended for a significant period of time, is sufficient for a jury to reasonably conclude that Curtis was grossly negligent. The Court will deny summary judgment with respect to the gross negligence claim against Defendant Curtis.

## III. Other Motions and Issues.

### A. Plaintiffs' Motion to Strike Affidavits and Request for Sanctions.

Plaintiffs ask the Court to strike the affidavits of Officer Contreras and Mike Olson because Defendants allegedly failed to disclose Olson as a witness and did not disclose Contreras in such a way that Plaintiffs could determine whether he should be deposed. Dkt. #221. Plaintiffs seek an award of sanctions pursuant to Rule 56(g) of the Federal Rules of Civil Procedure on the ground that the affidavits were submitted in bad faith. *Id.*

1    The Court will deny the motion to strike as moot because the Court did not rely on
2 Olson's affidavit in ruling on the summary judgment motions and did not grant summary
3 judgment based on Contreras' testimony.  The Court concludes that sanctions are
4 unwarranted under Rule 56(g).

5    **B.   Defendants' Motion to Strike Plaintiffs' Statement of Facts.**

6    Defendants ask the Court to strike Plaintiffs' entire statement of facts on the ground
7 that it purportedly cites to some inadmissible evidence and misconstrues other evidence.
8 Dkt. #269. This is an insufficient ground for striking the entire statement of facts. The Court
9 has considered Defendants' specific objections to the statement of facts, *see* Dkt. #270, and
10 has not relied on any facts that would be inadmissible at trial in ruling on the summary
11 judgment motions. The Court will deny Defendants' motion to strike.

12    **C.   Defendants' Joint Motion to Strike Various References in Plaintiffs' Response Brief and Statement of Facts.**
13

14    Defendants ask the Court to strike Plaintiffs' references to a risk assessment letter
15 authored by Peter Crowley and consultant reports prepared by Dennis Liebert, Eugene
16 Miller, and George Sullivan. Dkt. #272. The Court will deny the motion to strike. Plaintiffs
17 rely not on Crowley's risk assessment letter itself, but on his deposition testimony regarding
18 the letter.  Defendants acknowledged at oral argument that there was no objection to
19 Crowley's testimony at his deposition and that Defendants have no basis for objecting to the
20 use of testimony to which there has been no objection. The Court previously has found a
21 waiver of the deliberative process privilege with respect to the portions of the Liebert report
22 referenced by Plaintiffs. Finally, the Court has not relied on the Miller and Sullivan reports
23 in ruling on the summary judgment motions.[5]

24    **D.   Plaintiffs' Motion for Reconsideration.**

25    In a November 15, 2005 order, the Court dismissed Defendant Maricopa County
26 Sheriff's Office ("MCSO") on the ground that it is a non-jural entity. Dkt. #63. Plaintiffs

---

[5]Defendants may address the admissibility of these reports in motions in limine.

- 19 -

1  ask the Court to reconsider its order based on recent statements made by the MCSO in
2  another case.  Dkt. #212 at 2.  Plaintiffs contend that the inclusion of MCSO as a party in
3  this action is necessary because the County argues in its summary judgment motion that it
4  is not liable for the acts of MCSO or MCSO employees.  *Id.* at 4 (citing Dkt. #204 at 8-9).
5  The County, however, has withdrawn this argument.  Dkt. #227; *see* Dkt. #293.  The Court
6  accordingly will deny the motion for reconsideration.

**E.    Deposition of Sheriff Arpaio.**

Plaintiffs have renewed their request to depose Sheriff Arpaio.  The Court concludes that Plaintiffs still have not shown that the need for Defendant Arpaio's testimony is extraordinary or that the evidence he possesses could not be obtained through other discovery tools.  Dkt. #143.  The Court will not permit the deposition.

**IT IS ORDERED:**

1.   Defendants' motions for summary judgment (Dkt. ##201, 204) are **granted in part** and **denied in part** as set forth in this order.

2.   The parties' motions to strike (Dkt. ##221, 269, 272) are **denied**.

3.   Plaintiffs' motion for reconsideration (Dkt. #212) is **denied**.

4.   The Court will set a final pretrial conference by separate order.

DATED this 9th day of November, 2006.

*David G. Campbell*
United States District Judge