**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pearl Wilson, Personal Representative of the Estate of Phillip Wilson, deceased; Terry Wilson and Pearl Wilson, surviving parents of Phillip Wilson,<br><br>Plaintiffs,<br><br>vs.<br><br>Maricopa County, a public entity, et al.,<br><br>Defendants. | No. CV-04-2873 PHX-DGC<br><br>**ORDER** |

Phillip Wilson was an inmate at a Maricopa County jail known as "Tent City." On July 22, 2003, he was assaulted by other inmates and later died from his injuries.

Phillip Wilson's estate and parents, Pearl and Terry Wilson, asserted claims against Defendants Maricopa County and Sheriff Joseph Arpaio under 42 U.S.C. § 1983 for violations of Phillip Wilson's constitutional rights under the Eighth and Fourteenth Amendments, and for violations of Pearl and Terry Wilson's Fourteenth Amendment rights to the continued family relationship of Phillip. Am. Compl. ¶¶ 39-50. Plaintiffs also asserted gross negligence claims under Arizona law. *Id.*

On May 11, 2007, following a vigorously-litigated three-week trial, the jury returned a unanimous verdict in favor of Defendants. Dkt. #510. Plaintiffs now seek a new trial, arguing that the jury's verdict was against the clear weight of the evidence and that the Court erred on several legal rulings. Dkt. #537. For the reasons set forth below, the Court will

1 deny Plaintiffs' motion.[1]

## I. Weight of the Evidence.

Plaintiffs seek a new trial under Rule 59(a) of the Federal Rules of Civil Procedure. The issue to be decided in ruling on such a motion is not whether the jury's verdict was supported by substantial evidence, but whether it was "against the clear weight of the evidence." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). In resolving a Rule 59(a) motion, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Id.*; *see also Molski v. M.J. Cable, Inc.*, 481 F.3d 724 (9th Cir. 2007).

The Ninth Circuit has provided the following guidance:

> On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. . . . If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

*Landes*, 833 F.2d at 1371-72 (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 48-49 (1973) (quotation marks and footnotes omitted)).

Having considered all of the evidence presented by the parties at trial, the Court is not left with a definite and firm conviction that a mistake has been made in this case. To the contrary, the Court concludes that the weight of the evidence supports the jury's verdict.

This was not a negligence case. Plaintiffs bore a heavy burden of proof. In order to establish that Defendants violated their constitutional rights, Plaintiffs were required to prove that the County, or Sheriff Arpaio acting as the final policymaker for the County, acted with

---

[1] Plaintiffs' request for oral argument (Dkt. #537) is denied. The Court is well familiar with the factual and legal issues in this case and the parties have fully briefed the issues raised in Plaintiffs' motion. Oral argument would not aid the Court's decision.

1  "deliberate indifference." Dkt. #500, Instruction 13. To show deliberate indifference, Plaintiffs were required to prove that Defendants knew of a substantial risk of serious harm to inmates at Tent City and consciously chose to disregard that risk. *Id.*

Plaintiffs alternatively argued that Defendants violated their constitutional rights by failing to train employees of Maricopa County. Here again, Plaintiffs were required to prove deliberate indifference. Deliberate indifference for purposes of this claim was the conscious choice to disregard the obvious consequences of one's acts or omissions. *Id.*, Instruction 14. Plaintiffs were required to show that Defendants knew that their failure to train made it highly predictable that their employees would engage in conduct that would deprive persons such as Phillip Wilson of their constitutional rights. *Id.*

To prevail on their gross negligence claim, Plaintiffs were required to prove that Defendants were recklessly indifferent to the results of their actions. Specifically, Plaintiffs were required to prove that Defendants knew, or that a reasonable person in their position should have known, that their action or inaction created an unreasonable risk of harm and that the risk was so great that it was highly likely to occur. *Id.*, Instruction 16.

Plaintiffs presented no evidence that any County employee knew Phillip Wilson was at risk. Rather, Plaintiffs' case was based on the more general argument that Tent City was unsafe, Defendants knew it was unsafe, and Defendants failed to take steps that would have rendered it safe.

The evidence presented during trial suggested, however, that Tent City is a relatively safe jail. The cross-examination of Plaintiffs' expert witness was particularly telling. Mr. Bair conceded that the assault statistics at Tent City were considerably better than at his own former facility in Virginia – a facility he viewed as safe. He also conceded that the assault statistics were vastly better than those of a facility in New York City against which he had testified previously.

Other witnesses established that there has been only one assault-related death at Tent City among the 300,000 inmates who have been housed there. That death, sadly, was Phillip Wilson's. Witnesses testified that the only other serious assault ever to occur at Tent City

1 was the Flanders assault in 1996, an assault to which Plaintiffs devoted significant attention 2 during trial. Witnesses generally testified that weapons are virtually never found at Tent 3 City, that guards feel safe there, and that guards do not remember any incident like the 4 Wilson assault.

5 The evidence further suggested that inmates at Tent City are short-time inmates, 6 serving less than one year, working, and anxious to get out of jail. They generally are well-7 behaved. Inmates like being in Tent City. Indeed, the County punishes them by taking them 8 out of Tent City.

9 Defendants also presented evidence of substantial efforts to improve the safety of Tent 10 City since the Flanders assault in 1996. The long list of improvements corroborated the fact 11 that the jail is safe and that Defendants intended to make it so, even if Sheriff Arpaio's 12 philosophy is one of an austere living environment.

13 Given this evidence, the jury acted reasonably in concluding that Plaintiffs had failed 14 to prove that Defendants had acted with deliberate indifference or reckless disregard to the 15 safety of inmates. Had this been a simple negligence claim against guards on the ground on 16 the date of Phillip Wilson's assault, a different result might have been warranted. But 17 Plaintiffs bore a higher burden.

18 Plaintiffs argued strenuously during trial, and continue to argue in their motion, that 19 Tent City was understaffed. The evidence on this issue was disputed. Defense witnesses, 20 including witnesses Williams, Sheridan, and Arpaio, testified that the number of filled 21 correction officer positions at Tent City exceeded the number recommended by the County 22 consultant on whom Plaintiffs relied for much of their claim. Chief Sheridan testified that 23 understaffing was never the operational philosophy of the Sheriff's office. Sheridan and 24 Chief Deputy Hendershott both testified concerning efforts made by the County to hire good 25 detention officers and to fill positions that were vacated for reasons such as military leave.

26 With respect to staffing on the day of Phillip Wilson's assault, Lieutenant Morwood 27 testified that the tower officer was able to supervise inmates on the yard. Sergeant Curtis 28 testified that he assigned Officer Woolf to both the West Gate and Yard One duties because

the West Gate was not a full-time position and, with kitchen crews coming and going from the facility, there were few inmates in the yard to be supervised. Witnesses further testified that the number of witnesses on the yard was small due to the heat of the day and the fact that most inmates sought refuge in the air-conditioned day room. Sergeant Curtis and Officer Contreras testified that Contreras was responsible for supervising Yard One in Officer Woolf's absence and that Contreras walked the yard twice while Woolf was gone, including one time shortly before the assault on Phillip Wilson. The evidence suggested that there were approximately 30 inmates on the yard and that Officer Contreras saw nothing suspicious when he walked it shortly before the assault.

Defendants also presented evidence, including testimony from Plaintiffs' expert, that it is impossible to prevent all assaults in a prison environment – that inmates generally can find a way to assault another inmate if they are intent on doing so. Officer Leon testified that the assailants of Phillip Wilson were in and out of his tent in less than one minute. Lieutenant Morwood testified that he arrived at the scene within 30 to 90 seconds of Officer Leon's radio call, and Sergeant Curtis testified that he was at the scene within a minute or two.

Plaintiffs argued during the trial, and continue to argue in their motion, that Defendants failed to classify inmates at Tent City. Again, the evidence was disputed. Defendants presented evidence that dangerous and violent criminals were not housed at Tent City, but instead were detained in "close custody." These included inmates who were members of security threat groups. There was considerable disputed evidence concerning whether or not the assailants in this case were members of the Aryan Brotherhood prison gang, and whether Defendants complied with their own classification procedures. As noted above, however, the assault statistics of Tent City and testimony of several witnesses suggested that the facility is safe as jail facilities go, and generally is regarded as a desirable place to be incarcerated. Given this fact, as well as the screening procedures described by various defense witnesses, the jury reasonably concluded that classification issues did not rise to the level of deliberate indifference or gross negligence.

In response to Plaintiffs' claim that Defendants failed properly to train detention officers, Defendants presented evidence that each detention officer received seven or more weeks of academy instruction and on-the-job training. Defendants further presented evidence that detention officers were trained on inmate assaults and supervision of yards. Given this evidence, the jury reasonably could conclude that the lack of training did not rise to the level of deliberate indifference or gross negligence.

**II.    Legal Errors.**

Plaintiffs contend that the Court made a number of legal errors during the trial. The Court will address the alleged errors separately.

**A.    Evidence Concerning the Reason for Phillip Wilson's Assault.**

Detective Troy Brown, who led the County's criminal investigation into the Wilson assault, was called as a key witness during Plaintiffs' case-in-chief. In response to Plaintiffs' questions, Detective Brown testified extensively about his investigation and conclusions. During cross-examination by defense counsel, Detective Brown was permitted to testify concerning his conclusion that Phillip Wilson was assaulted as a result of his criminal activities outside of the jail. Specifically, Detective Brown concluded that Phillip Wilson was assaulted because he was involved in drug dealing and counterfeiting of money orders, he owed people money as a result of these activities, and those individuals put a "hit" on him. Plaintiffs contend that the Court erred in allowing Detective Brown to provide this testimony.

Throughout their motion, Plaintiffs purport to describe the jury's thinking and the reasons for its verdict. Plaintiffs claim that the jury was prejudiced against Phillip Wilson by Detective Brown's testimony, that the jury decided from the beginning that Phillip Wilson was a bad person who had made bad life choices, and that the jury therefore denied any recovery to Wilson's estate and parents. Rule 606(b) of the Federal Rules of Evidence makes clear, however, that jurors may not be asked to "testify as to any matter or statement occurring during the course of the jury's deliberation or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict[.]" Thus, whatever uncited sources Plaintiffs purport to rely on in describing the

1 reasoning of the jury in this case, they are inappropriate under Rule 606(b). The Court made
2 its decisions during trial, and will make its decision on this motion, on the basis of the rules
3 of evidence and events that occurred during the course of trial, not on speculation concerning
4 the reasons for the jury's verdict. The Court notes, nonetheless, that the jury in this case was
5 attentive and studious throughout the three-week trial, took their obligations seriously, and,
6 the Court believes, based their decision on a fair consideration of the evidence as a whole.

7 **1.      The Court's Other Rulings.**

8 Before addressing Detective Brown's testimony, some context is needed. The Court
9 repeatedly rejected Defendants' efforts to place the criminal history of Phillip Wilson before
10 the jury. The Court granted Plaintiffs' Eleventh Motion in Limine Regarding John Morgan
11 and John Morgan's Presentence Report. Dkt. #417 at 11-15. Plaintiffs wanted to call Mr.
12 Morgan, who was Phillip Wilson's former roommate, to testify that Phillip Wilson was an
13 accomplished counterfeiter who could create accurate counterfeit money and money orders,
14 that an individual named Frank Bonini paid Wilson to create counterfeit currency, that
15 Wilson reneged on the deal, and that Bonini therefore sought to harm Wilson, leading
16 Morgan and Wilson to go into hiding at an apartment Morgan rented under a false name.
17 Defendants further wanted to present evidence that three individuals broke into the apartment
18 the day after Phillip Wilson's arrest, held Morgan against the wall, and left with Wilson's
19 computer. Defendants further wanted to present evidence that Frank Bonini persuaded Karl
20 Stovall, an inmate at Tent City, to assault and kill Phillip Wilson. If Morgan denied these
21 facts, Defendants sought to call several witnesses to testify, including investigator Keith
22 Sobraske, probation officer Melanie Strosberg, and County investigator Steve Gerlach.
23 These individuals would have testified that Morgan conveyed all of this information to them.
24 *Id*. For reasons explained in the Court's pretrial ruling, the Court excluded all of this
25 evidence. *Id*. During trial, the Court also denied admission of the presentence report in
26 which John Morgan stated that Phillip Wilson was being hunted by other individuals.

27 In addition, the Court precluded Defendants from calling Detective Gerlach to testify
28 about his investigation of the reasons for Phillip Wilson's assault. This investigation

included a visit by Detective Gerlach to Phillip Wilson's apartment, where he spoke to John Morgan and saw damage done to the apartment by the individuals who broke in the day after Wilson's arrest. The Court excluded this evidence during the course of the trial. Dkt. #484.

The Court also refused to allow defense counsel to ask Pearl and Terry about the effect of Phillip's drug use on their marriage, to play portions of a telephone conversation between Pearl and Phillip in which she stated that Phillip would always be in jail for drug use, and to elicit evidence that Plaintiffs did not see their son for years due to his incarceration. The Court also precluded Mr. Bailey from testifying that Phillip Wilson was a medium security inmate due to his prior convictions. These rulings were based on the Court's conclusion that the prejudicial effect of such evidence would substantially outweigh its probative value.

Thus, the Court consistently ruled that evidence of Phillip Wilson's drug use, previous convictions, and outside criminal behavior were inadmissible. The Court permitted Detective Brown to testify about his conclusions only after Plaintiffs called Brown as a witness, asked the jury to accept his conclusions, and yet presented an incomplete picture of his findings.

### 2.     Detective Brown's Testimony.

Plaintiffs called Detective Brown to testify on the second day of trial. He was a key witness in their case. Plaintiffs sought to present his conclusions as authoritative determinations concerning the reasons for Phillip Wilson's death.

Plaintiffs began by spending considerable time establishing Detective Brown's expertise. Through leading questions, Plaintiffs established that he had been an investigator for the County since 1990, had been trained to be a "good investigator," and "was highly enough regarded within MCSO that MCSO made [him] acting supervisor of general investigations . . . from time to time." Dkt. #514 at 5-6. Plaintiffs further established that Detective Brown had a "long and distinguished career," that he was a sworn peace officer, that he was the lead investigator on Phillip Wilson's assault, that the investigation lasted 22 months, and that Detective Brown "did a thorough and competent job." *Id*. at 6-10. Plaintiffs explained to the jury through leading questions that Detective Brown's investigation included "interviewing witnesses, reviewing documents, looking at evidence." *Id.* at 10. Plaintiffs

- 8 -

1 suggested that this was an adequate basis for the investigation: "And you relied on those
2 interviews and the documents you reviewed to reach your – excuse me – reach your
3 conclusions in connection with your investigation?" *Id.*  Plaintiffs concluded their
4 introduction of Detective Brown by again establishing that he "did a very thorough and
5 competent job." *Id.*[2]

6       Having laid this foundation, Plaintiffs proceeded to elicit some 28 conclusions from
7 Detective Brown's investigation. These included the following: (1) the temperature was 108
8 degrees on the afternoon of Phillip Wilson's assault; (2) Wilson's assailants entered his tent
9 and lowered the side panels; (3) Officer Morwood was the first person to arrive at the scene
10 after the assault; (4) Lieutenant Johnson was the second person to arrive; (5) tent flaps
11 typically are not rolled down during the summer; (6) the assailants used a metal drawer as a
12 weapon to strike Wilson in the head; (7) the assailants "stomped" on Phillip's head hard
13 enough to make a crunching sound; (8) the assailants had enough time after the attack to leave
14 the yard and discard their blood-stained clothing in portable toilets before any detention
15 officer arrived; (9) the assault on Wilson was a "gang hit"; (10) the gang was the Aryan
16 Brotherhood; (11) Karl Stovall and David Brauderick were two members of the Aryan
17 Brotherhood in Tent City on the day of the assault; (12) several other Aryan Brotherhood
18 members, identified by their names and nicknames, were involved in the assault; (13) David
19 Brauderick was an Aryan Brotherhood probate member (Plaintiffs then suggested that probate
20 members were required to "make a hit" on somebody to become full members of the
21 Brotherhood); (14) Robert Buskirk was the second-in-command in the Aryan Brotherhood in
22 Tent City on the day of the assault; (15) Buskirk went into Wilson's tent and lowered the flaps
23 so that tower officer Leon could not see what was happening; (16) five people were involved
24 in the attack on Wilson and all were felony repeat offenders; (17) Buskirk and others got
25 irritated with Wilson's screaming and kicked him in the throat; (18) the assailants broke

---

[2] The Court's reference to leading questions is not intended to suggest that Plaintiffs' examination was somehow improper, but rather to show that it was deliberate.

Wilson's fingers while trying to remove his rings; (19) Wilson's head was hit so viciously that it made a sound "like a ripe piece of fruit hitting the concrete"; (20) a white council leadership organization was operating within Tent City at the time of the assault; (21) the assailants bore Aryan Brotherhood tattoos; (22) by the time County officers arrived at the scene, the blood under Wilson's head "was already coagulated"; (23) Officer Morwood, the first officer to arrive at the scene, felt "abandoned" by other detention officers; (24) one of the identifying tattoos on the Aryan Brotherhood members was a white pride tattoo on Mr. Buskirk; (25) inmate-on-inmate assaults in Tent City "jumped by almost a hundred percent" between 2002 and 2003; (26) the assailants of Phillip Wilson knew at the time of the attack that there were only a few officers on the yard to protect inmates; (27) the assault on Wilson started at 2:45 p.m.; (28) tower officer Leon did not call for help until 2:53 p.m.  Dkt. #514 at 10-23; TR 4/26/07 at 27-80.

      Through this line of questioning, Plaintiffs plainly spelled out their theory of the case for the jury – that violent gang members were allowed into Tent City, that these gang members were readily identifiable by their tattoos, that the gang members chose to viciously assault Phillip Wilson, that one of the motives for the assault may have been a right-of-passage by a probate gang member, and that the gang members calculated their attack so as to obscure it from the tower officer's view and to carry it out when few detention officers were on the yard.  These assertions were consistent with Plaintiffs' theory that the yard was understaffed, that the County failed to classify and exclude gang members from Tent City, and that the assailants of Phillip Wilson readily could have been identified beforehand through their tattoos, gang markings, and criminal records.  Thus, the reason for the assault, according to testimony elicited from Detective Brown, was that Defendants failed to make the jail safe and placed Phillip Wilson and other modest offenders in the midst of vicious gang members.

      On cross-examination, Defendants sought to elicit another of Detective Brown's investigative conclusions – that Phillip Wilson was assaulted because of his drug dealing and counterfeiting activities outside of the jail, activities that led to him owing substantial sums of money to the people who decided to hurt him.  Plaintiffs objected to this line of

questioning, and the Court held a lengthy sidebar discussion. During the sidebar, Plaintiffs' counsel argued that this line of questioning was irrelevant, prejudicial, and based on "hearsay within hearsay." When the Court observed that Plaintiffs' extensive questioning of Detective Brown had called for his conclusions based on interviews and documents, and therefore elicited conclusions that had been based in part on hearsay, Plaintiffs' counsel responded that their questions had only sought conclusions based on single hearsay, whereas the conclusions Defendants sought to elicit were based on double hearsay. The Court rejected this argument. Plaintiffs had made no effort during the course of their questioning to determine the precise foundation for Detective Brown's conclusions, instead suggesting to the jury that all of the conclusions were well-founded. Now that Defendants sought to elicit additional conclusions from the same investigation, the Court rejected Plaintiffs' suggestion that the conclusions were unfounded. TR 4/25/07 at 91-93.

The Court took under advisement Plaintiffs' arguments that this testimony by Detective Brown would be irrelevant and prejudicial. After considering the matter, the Court overruled these objections and permitted the testimony to come into evidence. The Court explained its reasoning as follows:

> It's my conclusion that the conclusions Detective Brown reached in his investigation regarding the possible reasons for Phillip Wilson's death [are] relevant under 401 and 402. [They are] relevant to the question of whether the defendants' deliberate indifference or gross negligence led to this assault, as opposed to other factors leading to the assault.
>
> It's also relevant in light of the plaintiffs' extensive focus on the fact that this was a hit by the Aryan Brotherhood prison gang, and the plaintiffs' assertion that because it was a gang hit, and because the sheriff's office knew there were gangs in the jail, the sheriff's office should have anticipated and prevented this gang hit.
>
> Since that evidence is in, I think it's quite relevant for the jury to know that there were possibly other reasons not related to gangs that led to the assault on Phillip Wilson. So I conclude that it is clearly relevant under 401 and 402.[3]

---

[3] This point became even more relevant later, when Plaintiffs' expert, Mr. Bair, confirmed that inmates can find ways to carry out assaults if they want to – that inmate-on-inmate assaults can occur even in the best-run facilities. Dkt. #524 at 111-12.

- 11 -

>The question, then, is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Rule 403. I find that to be a closer question, but it's my conclusion that it is not substantially outweighed by the danger of unfair prejudice. That is the requirement under Rule 403.
>
>I believe that it is highly relevant to the two matters I just mentioned, and that the risk of prejudice that will arise from the fact that it discloses that Phillip Wilson might have been engaged in other criminal behavior does not substantially outweigh that relevance.
>
>However, if the Plaintiffs want to request an instruction at the end of the case to the effect that the jury should not consider Phillip Wilson's criminal background as impacting the question of liability but should instead just consider the reasons for his assault in deciding whether or not the defendants were negligent, or something to that effect, I will certainly entertain that instruction and hear from both sides on it, which I think will further reduce the prejudicial effect.
>
>So my ruling is that the defendants can inquire into what Detective Brown's conclusions were regarding the reasons for the assault, and what his conclusions were regarding whether Phillip Wilson was warned.
>
>You may not inquire, Mr. Struck, into what he heard. I don't want him recounting hearsay. We're going to be limited to the conclusions he reached as his – as a result of his investigation in the manner that the plaintiffs inquired about that.

TR 4/26/07 at 110-12.

The Court thereby permitted Defendants to ask precisely the same kinds of questions Plaintiffs had elicited through their extensive examination of Detective Brown. Those questions were limited to his conclusions, based on the investigation that Plaintiffs themselves had asserted to be thorough and well-founded. Despite the Court's express invitation to suggest a limiting instruction that would minimize any prejudice from this evidence, Plaintiffs never requested one.

### 3.     Rule 404(b).

Plaintiffs contend that the Court should have excluded Detective Brown's testimony under Rule 404(b). The Court initially notes that Plaintiffs did not make this objection during trial. As noted above, their objection was based on relevancy, prejudice, and double-hearsay. The objection therefore has been waived.

Even if the objection had not been waived, it would have been overruled. The Court doubts that Rule 404(b) applies to this issue. The rule generally applies when one party seeks

- 12 -

to introduce prior acts evidence concerning another party. That is not the case here. The question addressed by this evidence is what caused Phillip Wilson's death, the deliberate indifference of Defendants or other factors? Such a question appears to be best addressed under the relevancy standards of Rule 402 and the unfair prejudice standards of Rule 403.

Even if Rule 404(b) does apply, however, it would not preclude Detective Brown's testimony. The rule prohibits the introduction of evidence concerning "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Detective Brown's testimony was not admitted for this purpose. There was no issue in the case as to whether Phillip Wilson, while at Tent City, acted "in conformity" with any prior criminal behavior, and Defendants never suggested that the testimony should be used for this purpose.

As Rule 404(b) makes clear, evidence of other crimes, wrongs, or acts may "be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This list is non-exclusive; evidence may be admitted under Rule 404(b) to address similarly relevant issues. 2 J. Weinstein & M. Berger, *Weinstein's Federal Evidence,* § 404.20[1] (2007). In this case, Detective Brown's conclusions were admitted to address Plaintiffs' assertion that Phillip Wilson was killed as a result of a gang hit by the Aryan Brotherhood and Defendants' deliberate indifference to the risk of such a hit.

The Ninth Circuit has established a four-part test for evaluating the admissibility of evidence under Rule 404(b): (1) there must be sufficient proof for the jury to find that the defendant committed the other act, (2) the other act must not be too remote in time, (3) the other act must be introduced to prove a material issue in the case, and (4) the other act must, if knowledge or intent is at issue, be similar to the offense charged. *Duran v. City of Maywood*, 221 F.3d 1127, 1132-33 (9th Cir. 2000). This test was satisfied here. The first element essentially asks whether the evidence is sufficiently reliable. Plaintiffs themselves emphasized to the jury that Detective Brown's conclusions were reliable and the result of a thorough and diligent investigation. The second element – that the acts not be too remote in

- 13 -

1 time – was also satisfied. Detective Brown's conclusion was based on incidents that occurred
2 shortly before Phillip Wilson's incarceration, a few months before his assault. This fact was
3 made clear by evidence the jury did not hear, evidence concerning John Morgan's statements
4 to various investigators and Detective Gerlach's visit to Phillip Wilson's apartment. The
5 Court may consider such non-admissible evidence in deciding whether Detective Brown's
6 conclusions were admissible. *See* Fed. R. Evid. 104(a). Third, Detective Brown's
7 conclusions were clearly relevant to important issues in the case, as described above. The
8 fourth requirement – that the prior act be similar if knowledge and intent are at issue – did not
9 apply. The question was not Phillip Wilson's knowledge or intent, and the prior acts were not
10 introduced to prove his knowledge or intent. Thus, the similarity requirement is inapplicable.

**4.     Rule 403.**

The Court also concludes that it ruled correctly in overruling Plaintiffs' Rule 403 objection. Detective Brown's conclusions became highly relevant once Plaintiffs had elicited extensive testimony about his other conclusions. Had Plaintiffs not elicited these conclusions and emphasized their reliability to the jury, the Court likely would have ruled consistently with its previous rulings. But once Plaintiffs had sought to use his conclusions to their distinct advantage, the remainder of his conclusions became highly relevant.

The relevancy of those conclusions was not substantially outweighed by the risk of unfair prejudice. This conclusion is based on several factors.

First, the jury already knew that Phillip Wilson was in jail. That was a known fact in this trial. The jury therefore knew that he had engaged in prior criminal activity.

Second, Plaintiffs' counsel told the jury during opening statement that Phillip Wilson was in jail because of a probation violation resulting from marijuana use. The jury thus knew that he was involved in illegal drugs.

Third, the Court expressly invited Plaintiffs to propose a limiting instruction that would minimize any prejudicial effect of Detective Brown's conclusions. Plaintiffs state in their motion that they made a strategic decision not to request such an instruction. Given the clear relevancy of this evidence and what the jury already knew about Phillip Wilson, it was not

1 plain error for the Court not to give such an instruction in the absence of a request from 2 Plaintiffs.

3 Given these circumstances, the Court correctly concluded that the risk of unfair 4 prejudice did not substantially outweigh the highly probative value of Detective Brown's 5 conclusions. Rule 403 therefore did not require exclusion of the evidence.

6 **5. Foundation – Double Hearsay.**

7 Plaintiffs again argue in their motion, as they did at sidebar, that Detective Brown's 8 conclusions were inadmissible because they were based on double hearsay. Plaintiffs 9 implicitly continue to assert, as they did at sidebar, that they could elicit conclusions based 10 on single hearsay. Essentially, Plaintiffs are making a foundation argument – that their 11 favorite conclusions were reliable, but Defendants' were not.

12 As already noted, however, Plaintiffs presented the entire investigation and conclusions 13 of Detective Brown to the jury as reliable and well-founded. Plaintiffs made no effort to lay 14 a foundation as to which conclusions were based on single hearsay or double hearsay. 15 Moreover, when counsel from either side sought to elicit hearsay statements from Detective 16 Brown, the Court sustained hearsay objections. This happened both during Plaintiffs' 17 questioning (TR 4/26/07 at 72-73) and Defendants' (*id.* at 112, 122).

18 Moreover, Plaintiffs' counsel on redirect examination asserted that Detective Brown's 19 conclusions concerning the reasons for Phillip Wilson's assault were based on hearsay and 20 were never confirmed through his investigation. Plaintiffs even elicited another possible 21 reason for the attack – that Phillip Wilson was an informant. TR 4/26/07 at 124. Thus, the 22 jury ultimately was exposed to the full array of Detective Brown's conclusions and Plaintiffs 23 were permitted to attack the veracity of the conclusions with which they disagreed.

24 **6. One More Argument.**

25 Plaintiffs assert that Detective Brown's conclusions concerning the reasons for Phillip 26 Wilson's assault were less reliable because they were not found in the case summary he 27 prepared. *See* Ex. 207. In fact, the conclusions are found in the summary. *See id*. at 11, 13. 28 Plaintiffs then attempt to make a more refined argument, asserting that the conclusions are not

- 15 -

reliable because they are not found in the penultimate paragraph of the summary which begins with the words "in conclusion." Plaintiffs' argument might have some plausibility if they had carefully confined their evidence to the conclusions in this paragraph, but they did not. Most of the 28 conclusions elicited by Plaintiffs are not found in this paragraph, but instead are spread throughout Detective Brown's case summary. Plaintiffs therefore have no basis for arguing that Detective Brown's conclusions concerning the reason for the assault are inadmissible because they are not found in this paragraph.

### B. Evidence of Failure to Prosecute Assailants.

Plaintiffs argue that the Court erred by failing to admit evidence that none of Phillip Wilson's assailants were arrested, charged, or prosecuted for the assault. As the Court previously noted, however, the fact that the Maricopa County Attorney's Office – an office overseen by a separately elected County official – chose not to prosecute the assailants is not relevant to any issue in this case, nor is it probative of the state of mind of Defendants at the time Phillip Wilson was assaulted. Dkt. #417 at 24.

Plaintiffs complain that the defense of this lawsuit was based on pointing the finger at Phillip Wilson's assailants, and yet it was Plaintiffs, not Defendants, who spent the most time describing the violent nature of the assailants and the brutality of their attack. Plaintiffs argue that evidence concerning the assailants was admissible, at best, to show comparative fault with respect to the gross negligence claim, and had no relevance on the § 1983 claim. Dkt. #537 n. 7. In addition to the fact that Plaintiffs elicited most of the evidence, this argument simply is incorrect. That Phillip Wilson was beaten and killed by fellow inmates is centrally relevant to the question of who caused his death, a key issue in the § 1983 claim. Finally, Plaintiffs argue that the Sheriff's office and the detectives who investigated the assault had the ability to "charge subjects with crimes." *Id*. at 13. This too is incorrect. Prosecution falls within the purview of the County Attorney's Office, an entity never involved in this case.

### C. The Miller and Sullivan Reports and the *Flanders* Opinion.

The Court properly excluded the Miller report. The report was hearsay, remote in time, and primarily concerned with issues of excessive force. Plaintiffs argued that the report was

- 16 -

an admission by the County under Rule 801(d)(2)(C) or (D), but this plainly was incorrect. Miller was retained by the Department of Justice, not the County.[4]

Plaintiffs argue that the Miller report was not barred by the hearsay rule because it was relevant on the question of Defendants' notice. But the notice was only meaningful if the statements in the Miller report were true. Thus, Plaintiffs clearly sought to admit the Miller report for the truth of the matter asserted therein – that the jails were understaffed in 1996.

The Sullivan report was inadmissible for the same reasons. Sullivan was not an agent authorized to speak on behalf of the County. He was hired jointly as an expert by the Department of Justice and the County to take a fresh look at issues in the jails. He was acting in a neutral-expert capacity; he was not speaking for the County. Thus, his report was not admissible under Rule 801(d)(2)(C) or (D).

Nor was Sullivan's report admissible solely on notice. His report, like Miller's, went to a key issue in the case – whether there were staffing shortages at the jail. The Sullivan report was relevant because it asserted that such shortages existed. In other words, its relevance was in the truth of the matter asserted. The report properly was excluded as hearsay.

The Court also notes that the Miller and Sullivan reports were cumulative. Plaintiffs presented abundant evidence concerning the County's alleged knowledge of staffing shortages and other problems at the jail. The Miller and Sullivan reports would have made no difference in the outcome of this case.

Finally, Plaintiffs argue that the Court should have admitted the Arizona Court of Appeals decision in *Flanders v. Maricopa County*, 54 P.3d 837 (2002). The Court previously discussed this issue at length. Dkt. #417 at 1-5. As the Court correctly concluded there, the Court could and did take judicial notice of the fact that the decision was rendered, the date of

---

[4]Plaintiffs' reply memorandum discloses, for the first time in this litigation, a 1996 letter from the Department of Justice to the County. Dkt. #542, Ex. A. This letter confirms the Court's previous conclusion that Miller and Sullivan were not agents of the County authorized to speak on its behalf.

- 17 -

the decision, and its affirmance of a jury verdict in favor of Jeremy Flanders and against Defendants. But the Court could not properly take judicial notice of the statements made in the decision of the Court of Appeals. Dkt. #417 at 4. Moreover, it would have been clear error to do so, given the fact that the Court of Appeals did not purport to make factual findings. The court instead considered whether the jury's verdict in *Flanders* was supported by substantial evidence. In conducting this analysis, the court viewed the evidence in the light most favorable to Mr. Flanders. It would have been plain error for this Court to adopt such a one-sided review as a conclusive findings of the facts surrounding the Flanders assault.

### D. The Feasibility of Additional Officers.

Defendants never argued that it was infeasible to place additional officers on the ground. Rather, Defendants asserted that the facility was fully staffed at the time of the events in question. The Court properly prevented Plaintiffs from introducing subsequent remedial measures of increased staffing levels. Fed. R. Evid. 407.

### E. Stovall's Post-Event Classifications.

The Court properly excluded evidence concerning the post-event classification of Karl Stovall. Such evidence was only marginally relevant to the reasons for Phillip Wilson's assault and the culpability of Defendants. Moreover, the probative value of such evidence would have been substantially outweighed by waste of time and undue delay in this extensive trial. The events, reviews, and decisions concerning Karl Stovall's post-incident classification would have consumed the limited time the Court and parties had available for more relevant matters.

### F. Jury Instructions.

Plaintiffs assert a number of arguments concerning alleged defects in the Court's jury instructions. The Court will address them separately.

#### 1. § 1983 – Objective Standard.

Plaintiffs argue that the Court's § 1983 instructions were flawed because they did not contain an objective statement of the test for deliberate indifference. For three reasons, the Court concludes that its instructions were correct.

First, the Court followed the most recent Ninth Circuit model instructions. These instructions were issued only one month before trial and contain the most current statement of proper instructions in this circuit.

Second, the Court's instructions were essentially the same as those sought by Plaintiffs. Plaintiffs argue that the Court should have instructed the jury that they could find deliberate indifference if the risk of harm was "so obvious" that Defendants "should have known" that their failure to act would lead to a constitutional violation. The Court instructed the jury that it must find that Defendants "were deliberately indifferent to the *obvious consequences* of their failure to train employees adequately." Dkt. #500, Instruction No. 14 (emphasis added). Both instructions direct the jury to consider the obviousness of the risks created by Defendants' actions or inactions. If the jury found the risks to be obvious, it likely would find that Defendants were aware of those risks and chose to disregard them. The Court thus sees no substantive difference between the instructions.

Third, even if the Court erred by not including "should have known" language in the § 1983 instruction – language not found in the Ninth Circuit's model instructions or any case cited by Plaintiffs – the error was harmless. The Court's gross negligence instruction included the "should have known" standard: "A person is recklessly indifferent if he knows, *or a reasonable person in his position ought to know*, that (a) his action or inaction creates an unreasonable risk of harm, and (b) the risk is so great that it is highly probable that harm will result." Dkt. #500, Instruction No. 16 (emphasis added). The jury found for Defendants on Plaintiffs' gross negligence claim, a verdict which makes clear that the jury did not view Defendants as liable even under the "should have known" standard.

### 2.  Inaction Instruction.

Plaintiffs complain that the Court failed to instruct the jury that inaction may give rise to a § 1983 violation. Plaintiffs are incorrect. At Plaintiffs' request, the Court added the following sentence to Instruction No. 13: "A 'longstanding practice or custom' may be one of action or inaction." Dkt. #500. Moreover, Instruction No. 14 specifically addressed Defendants' alleged failure to train employees.


### 3. § 1983 Comparative Fault.

Plaintiffs argue that the Court should have given a comparative fault instruction under § 1983. Plaintiffs cite no authority for this proposition. Moreover, such an instruction would have made no difference. The Court gave a comparative fault instruction with respect to Plaintiffs' gross negligence claim – a claim requiring a lower level of culpability on the part of Defendants – and yet the jury still assigned no fault to Defendants.

### 4. Absence of a Negative Instruction.

Finally, Plaintiffs argue that although the Court correctly instructed the jury that Plaintiffs had to prove that "inmates" faced a substantial risk of harm, the Court also should have instructed the jury that Plaintiffs did not need to prove that Phillip Wilson personally faced a substantial risk of harm. Such an instruction was unnecessary. The Court's § 1983 and gross negligence instructions correctly stated Plaintiffs' burden of proof.

**IT IS ORDERED:**

1. Plaintiffs' Motion for New Trial (Dkt. #537) is **denied.**
2. Defendants' Motion to Strike Attachment to Plaintiff's New Trial Reply (Dkt. #545) is **denied.**

DATED this 5th day of July, 2007.

David G. Campbell
United States District Judge